IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MARC D. REESE,
          Plaintiff,

v.                                              Civil Action No. 3:06CV46
                                              (Hon. John P. Bailey)

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,
          Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB")

under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433,

1381-1383f. The matter is awaiting decision on Plaintiff's Motion for Judgment on the Pleadings

and Defendant's Motion for Summary Judgment and has been referred to the undersigned United

States Magistrate Judge for submission of proposed findings of fact and recommended disposition.

28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

### I. Procedural History

Marc D. Reese ("Plaintiff") filed applications for DIB and SSI on March 22, 2004, alleging

disability beginning February 27, 2001, due to encephalomacia, depression, right leg problem, and

pancreatitis (R. 75). Both applications were denied initially and on reconsideration (R. 30, 37).

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security.
Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be
substituted, therefore, for former Commissioner Jo Anne B. Barnhart (or Acting Commissioner
Linda L. McMahon [if the caption was changed previously]) as the defendant in this suit. No
further action need be taken to continue this suit by reason of the last sentence of section 205(g)
of the Social Security Act, 42 U.S.C. §405(g).

Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Donald McDougall held on January 23, 2006 (R. 441). Plaintiff, represented by a non-attorney benefits representative, was present and testified, as did Vocational Expert Larry Bell ("VE"). On February 24, 2006, the ALJ issued an unfavorable decision (R. 22). The Appeals Council denied Plaintiff's request for review (R. 6), rendering the ALJ's decision the final decision of the Commissioner.

## II. Statement of Facts

Marc D. Reese ("Plaintiff") was born on November 26, 1961, and was 44 years old at the time of the administrative hearing (R. 48, 441). He completed his G.E.D. and has past relevant work as a clerk/cashier in a convenience store (R. 76). He stated on his application that he last worked in February 2001, and stopped working because he "got fired."

In May 1980 (age 18), Plaintiff enlisted in the Army (R. 123). He was in Basic Training, stationed at Fort Bliss, Texas. His induction physical took place on May 7, and he was entered on active duty on May 9. On May 15, a neurology consult was requested by someone to address Plaintiff's having had a subdural hematoma at age 2 ½, due to an automobile accident, and requesting neurology clearance for active duty (R. 126).

Plaintiff was examined on May 19, 1980. It was noted he had had a subdural hematoma from a car accident at age 2 ½. He was found to be generally healthy, however. Under Present Problem was stated:

> When he runs it's hard to breathe because of asthmatic bronchitis. No paralysis of arms or legs. Was "slow on the right side of my body." No other L[eft] handers in family. Says coordination is poor on right. Mother wants him home. "She's been depressed ever since I left." Trouble getting to sleep at night. Appetite; "I've been worrying so much" he chokes and nearly vomits. Says he's able to do [any]thing but the running. Has had no seizures. Not bothered by headache. Mother has headache.

Upon examination, Plaintiff was alert, pleasant, and fluent (R. 127). He had reduced sensory and motor function on the right side due to mild right hemiparesis. His station and gait were "ok," with mild right hemiparesis. All labs and x-rays were within normal limits. A CAT scan was within normal limits. The "Impression" was hemiparesis on the right, mild, due to encephalomacia (remote contusion). The recommendation was an expedited discharge, referred to as an EPTS ("Existed Prior to Service") Discharge. The doctor found that while Plaintiff did not meet medical fitness standards for enlistment, he was fit for retention.

The Medical Board found Plaintiff medically fit for further military service but noted that Plaintiff did not desire to continue on active duty. The Medical Board recommended Plaintiff be separated. Plaintiff agreed with the Board's recommendation.

There are no records in the record for the next 20 years, except for Plaintiff's social security earnings record (R. 56). That record shows no earnings for the years 1981 through 1987, $951.00 for 1988, $644 for 1989, $2081 for 1990, $231 for 1991, $684 for 1992, $2490 for 1993, $435 for 1994, $2389 for 1995, $6447 for 1996, $11,089 for 1997, $3859 for 1998, $2585 for 1999, $6674 for 2000, $2095 for 2001, and $220 for 2002, which is the last record of any income.

On June 30, 2000, Plaintiff was admitted to the hospital for isopropyl alcohol ingestion (R. 216). He said he had quit drinking in 1988, after a bout of pancreatitis, but re-started three months ago (12 years later) due, in part, to increased stress associated with taking care of his mother and father, both elderly invalids. His wife insisted he stop drinking, which he did for two days, but then he drank the rubbing alcohol. He became lethargic and his wife brought him to the hospital. He was vomiting and had abdominal pain. He was kept overnight. He seemed somewhat depressed and overwhelmed by the situation of his parents being sick along with financial difficulties. He was

3

discharged the next day. The record appears to show that Plaintiff was working during this time frame.

On November 27, 2000, Plaintiff was again admitted to the hospital, this time for acute alcohol intoxication with a blood alcohol level of .388 (R. 214). It was reported he had also stated some thoughts of suicide. He was discharged the next day. He denied any suicidal thoughts, and refused any inpatient detoxification program. He was still apparently working, as he was given an off work slip from November 27 to November 29, 2000.

On December 6, 2000, Plaintiff again presented to the hospital for an evaluation for detoxification (R. 212). He said he drank a bottle of vodka that morning, and was brought in by EMS. Plaintiff left the hospital about an hour later, however, saying he no longer wished to be seen. He was still apparently working.

According to Plaintiff, he quit his job on February 27, 2001, to take care of his invalid father (R. 132).

On March 7, 2001, Plaintiff again presented to the emergency room due to an overdose of alcohol (R. 197). He said he drank a half gallon of whiskey a day for the past four days. He also was depressed and worried because charges were pending against him for battery on a police officer. Plaintiff left that same day, after being encouraged to stay. He used very abusive language. The police were called, and then Plaintiff decided he would stay.

On November 24, 2001, Plaintiff was admitted to the hospital for right deep venous thrombosis ("DVT")(R. 128). He also carried diagnoses of anxiety and depression and episodic alcohol abuse. Plaintiff spent five days in the hospital, during which he was put on a nicotine patch for his history of smoking, but kept demanding to be let off the floor to smoke. He also was started

on DT precautions due to his alcohol abuse although he did not experience the "DT's." He was discharged five days later with warnings not to smoke or drink.

While in the hospital, Plaintiff said he was depressed because of stressors at home including taking care of his 80 year old father who was bedridden and suffered from dementia, and his mother who also had multiple medical problems. They both needed close attention. His relationship with his own wife was "volatile." He had been getting family counseling. He denied suicidal or homicidal ideation. He described his drinking for the past year as impulsive and binge drinking. For the 10 years prior, he had been sober. He believed he was drinking due to depression and anxiety over the stressors at home. His affect appeared restricted. Plaintiff was diagnosed with ethanol dependence and "depression due to alcohol abuse."

Plaintiff told his doctor he was unemployed, having quit his job "due to the fact that he wanted to take care of his invalid father." (R. 132). His father was unable to care for himself, "so he took off of work to take care of his father." He was also having stress at home with his wife as well as problems with his mother, father, and employment.

On December 4, 2001, Plaintiff presented to United Summit Center after having been committed to Sharpe Hospital for drinking and cutting his wrist (R. 287). Plaintiff reported no chronic medical problems that interfered with his life, and noted he took no prescribed medications. He described his employment status as "unemployed," stating he had not been bothered at all by his employment situation, and saying he had no need for employment counseling. He said he was not working because he was taking care of his father who had severe medical problems.

Plaintiff denied using any substances in the past 30 days. He went to one day of outpatient counseling or AA during the past 30 days, but said he did not see a need for alcohol treatment, even

though he claimed his alcohol problems were getting worse and were causing problems in his family.

Plaintiff reported he was separated from his wife, and said he was not satisfied with this situation (R. 289). However, he also said he lived primarily with his parents and was satisfied with those circumstances. He spent most of his time with his family. He had not been bothered by family or social problems in the past 30 days and felt treatment or counseling for family or social problems was not important to him at this time. He was under pressure to take care of his elderly parents, and his drinking had caused problems within the family. Plaintiff was separated from his wife and taking care of his parents, and "this is putting considerable stress on him and he claims this reason for most of his drinking."

On December 14, 2001, Plaintiff presented to the emergency room with alcohol intoxication (R. 188).

On March 7, 2002, Plaintiff presented to United Summit Center with a presenting problem of alcohol abuse and relationship problems and mental illness (R. 365). He was not on any medications. He said he was not employed but was looking for work (R. 360). His only diagnosis was alcohol dependency. His GAF was 55[2] (R. 360).

Upon mental status examination, Plaintiff was fully oriented; his speech was rapid; and his appearance, thought content, and sociability were within normal limits (R. 359). Plaintiff stated that alcohol abuse was causing considerable stress along with "having to take care of aging parents with lots of medical problems." He claimed no other problems except for a blood clot in his leg.

On May 6, 2002, Plaintiff was admitted to the hospital but left against medical advice prior

---

[2]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

to being seen by a physician (R. 185). He said he was not having suicidal or homicidal thoughts and was allowed to leave.

On July 19, 2002, staff at the Summit Center noted that Plaintiff continued to have problems with alcohol abuse (R. 352). He was unemployed and having trouble with finances, separation from his wife, and his ill parents. He was advised to attend counseling and AA meetings.

On August 2, 2002, Plaintiff was admitted to the hospital but left against medical advice prior to being seen by a physician (R. 183). He again stated he was not having homicidal or suicidal thoughts.

On August 5, 2002, Plaintiff presented to the hospital having been in the public intoxication ("PI") shelter (R. 171). He said he had not eaten in two days and had been drinking for a day and a half. He was interested in rehabilitation. He was discharged to the PI shelter with a police officer.

On October 3, 2002, Plaintiff presented to the hospital intoxicated and combative (R. 166). His mother initiated his commitment while he was in the emergency room. He discussed suicidal ideations with the nurse. He said he planned to cut his wrists and lock himself in his trailer. His alcohol level was .227. He was restrained. The diagnosis was alcohol intoxication with isopropanol ingestion. He agreed to stay, but then later became belligerent and refused to stay. He was unrestrained and then agreed to stay over night. He insisted on leaving the next day but was apprehended on the first floor and brought back for commitment hearing and transfer to Sharpe's Hospital for detoxification and treatment for suicidal ideation. He remained stable medically.

Plaintiff was admitted to William R. Sharpe, Jr. Hospital the next day (R. 142). It was noted that Plaintiff was a 40-year-old separated male who would return to live with his parents after discharge. He had a history of alcohol abuse. He reported stress over caring for his terminally ill

father. This stress coupled with his separation from his wife "gets him down and he goes on a drinking spree." He reported drinking up to 30 cans of beer two or three times a month. The rest of the time he claimed to be alcohol-free. He had been in treatment programs in the past with varied success. His drinking in the past month increased to the point he was drinking daily. His mother reported most of his stress came from his estranged wife, reporting he did better until he saw her, then would "get down" and start drinking. Plaintiff claimed the cut wrist was an accident while drunk, and denied any suicide attempt.

Plaintiff reported having four to five public intoxications in the past year, and reported alcohol blackouts during his binges. He gave a history of depression related to caring for his father. Upon admission, Plaintiff's diagnosis was alcohol dependence; rule out bipolar disorder; rule out substance induced mood disorder, with a GAF of 30.[3] His final discharge diagnosis, 13 days later, however, was only alcohol dependence and a GAF of 65.[4]

Plaintiff was referred to SADD and AA. He was also referred to MICA, but this was discontinued as his mother requested he come home to help take care of his father. He was willing to do so, and his doctors reported he seemed to have achieved good insight into his alcoholism. He did not exhibit significant symptoms of withdrawal and his mood symptoms were more related to

---

[3] A GAF of 21-30 indicates **Behavior is considerable influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., stays in bed all day, no job, home, or friends).

[4] A GAF of 61 to 70 indicates **Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.** Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

adjustment than to a mood disorder. His prognosis was good.

Plaintiff reported his depressive symptoms started when he began taking care of his father 1½ years earlier (also when he stopped working). Since then he felt depressed often, had lost interest in day-to-day activities, and felt lethargic and like not doing anything. He was often irritable. He reported 13 years of sobriety from age 25 -37. He admitted the depression was made worse by the alcohol.

Upon examination, Plaintiff was fully oriented (R. 139). His immediate and remote memory were intact, but his recent memory was poor. Speech was normal, and he denied delusions, hallucinations, obsessions, compulsions or suicidal or homicidal thoughts. His affect was restricted and his mood was mildly depressed. He was able to solve common problems and abstract proverbs. His fund of knowledge was intact. His judgment and insight were fair. He knew he had a problem with alcohol but did not fully understand the implications and tried to minimize them.

On October 18, 2002, after his discharge from Sharpe's, staff at the Summit Center noted that Plaintiff continued to have problems with alcohol abuse (R. 335). He was unemployed and having trouble with finances, separation from his wife, and ill parents. He was on no medication. He was again advised to attend counseling and AA.

On January 7, 2003, staff at the Summit Center noted that Plaintiff reported buying a bottle of alcohol but pouring it down the sink. He reported depression due to the fact that his parents had become very dependent on his continual presence in the home and as a result he had very little outside contact (R. 321).

On February 6, 2003, Plaintiff was again brought to the hospital by EMS after being picked up by police for public intoxication (R. 160). He was abusive, attempting to kick, bite and otherwise

attack security as well as the EMT's, so he was pepper sprayed by the staff security. His BAC was .307. He was uncooperative but clearly able to talk and had capacity. He was discharged to police to go to the PI shelter.

Later that same day, Plaintiff sneaked out of the shelter and went out and drank (R. 157). He was brought back to the ER for evaluation. His family refused to come get him, so he was sent back to the shelter.

After his second discharge to the PI shelter, Plaintiff was found passed out outside a grocery store and was brought back to the hospital by EMS (R. 155).

On February 20, 2003, Plaintiff was again brought to the ER by police, as an inmate (R. 153). He was intoxicated and charged with "Domestic Battery." The police needed a medical clearance to take him to the regional jail, which was given, and he was discharged into police custody.

On March 25, 2003, Plaintiff reported to the Summit Center for reassessment (R. 320). He reported he had been arrested and spent five days in prison in February. He reported he would like to see a therapist. He also noted he had a court date in April.

On June 5, 2003, Plaintiff was again brought to the ER by police (R. 147). He had been pepper sprayed because he was violent with the officers. He was cursing and uncooperative with the examination but was medically stable for discharge with the arresting officers for incarceration and evaluation at the regional jail. He was discharged in stable condition.

On October 10, 2003, Plaintiff was admitted to the hospital after ingesting isopropyl alcohol (R. 218). His mother had called the ambulance. He said he drank the rubbing alcohol to become intoxicated, not to hurt himself. He had no suicidal ideation. It was recommended he stay for psychiatric consultation but he refused and left against medical advice. His diagnosis was acute

isopropyl alcohol intoxication, history of alcohol abuse, history of pancreatitis, and history of depression (R. 220). The doctor did not believe Plaintiff was "committable as he has no suicidal intent at this time . . . ."

On December 29, 2003, Plaintiff presented to the Summit Center, stating that he was not dependent on alcohol and that he had not used any substance for mood or mind altering purposes for three months (R. 310). He said he had used alcohol in the past for self-medication, but that he was not, nor had he ever been, chemically addicted. The staff found this statement contrary to historical documentation, but confrontation with Plaintiff regarding this fact angered Plaintiff, though not to the point of aggression.

On January 12, 2004, Plaintiff underwent a Psychiatric Evaluation by David Peasak, CFNP (R. 299). Plaintiff said he lived at home with his 81 year old bedfast father and his 72 year old mother "who has a multitude of medical problems." Plaintiff felt that his life had worked against him because he had had to take care of everybody else and had not time for himself and "cannot hold a stable job due to the fact that he has to do for everybody else."

Upon mental health examination, Plaintiff was clean and his behavior was cooperative and appropriate. He denied thoughts of homicide or suicide. He denied that he had made a suicide attempt two years earlier. Eye contact was fair and speech was appropriate. His sleep was disturbed, but only because he was up and down with his father all night long. His affect and mood were bored. Subjectively he was sad and depressed "due to the fact that he is home 24/7 with his parents taking care of them." Objectively, however, he was stable. His memory was intact and appropriate. His judgment and insight were fair, but his reliability was "in question." He was diagnosed with alcohol

dependence; rule out personality disorder NOS. His current GAF was 70.[5]

On March 4, 2004, Summit Center Staff Physician Charles Scharf, M.D., examined Plaintiff (R. 292). Plaintiff's chief complaints were stress, anxiety, and depression. He was not currently working and was "taking care of his parents and has been taking care of them since 2001." Under "History of Present Illness" the doctor wrote:

> He takes care of his father who is basically bedridden. He would not put him in a nursing home because of his feelings about nursing homes. He quit work in 2001 and his wife left in 2001, so he has been under stress for both reasons.

(R. 292). Plaintiff denied any significant psychiatric history. He said he suffered a head injury when he was 2 ½ years old, "but could not elaborate on that." He was on no medications. He admitted he drank heavily until October 10, 2003, but said he had no history of blackouts.

Upon mental status examination, Plaintiff's eye contact was good. He spoke seriously and solemnly, and had a depressed affect and mood. He said he had trouble falling asleep and staying asleep. He said he felt stressed all of the time, and was easily agitated. He was irritable and moody. He felt tired most of the time and worried excessively. He had anhedonia. He got frustrated easily, and was distracted easily, but his memory was intact. He had no suicidal or homicidal ideation, and no true mood swings. The examiner opined Plaintiff "reacted to stress in a fairly normal way."

The doctor diagnosed major depression, recurrent, moderate severity; alcohol dependence, binge type drinking in early remission; personality disorder NOS; history of alcohol abuse, and "has been in a stressful and depressing situation for at least three years." His GAF was assessed as 50.

---

[5]A GAF of 61 to 70 indicates **Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.** Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

The doctor prescribed Lexapro.

Plaintiff filed his applications for DIB and SSI on March 22, 2004. His alleged onset date was February 27, 2001, the date he quit working (R. 62).

On Plaintiff's "Activities of Daily Living" form, dated April 21, 2004, he noted that both his parents depended on him for care (R. 65). He stated he had no trouble sleeping at night. He needed no help taking care of his personal needs and grooming. He prepared sandwiches, frozen dinners, soups, eggs, and cereal, although he noted that he "used to cook." He stated that he did laundry, vacuuming, paying bills, washing dishes, managing bank accounts, running errands, and taking out the trash at home (R. 66). No one helped with these chores. He shopped for food and drove. He had no "activities and interest[s]" with the exception of very little televison watching. He had no hobbies. He said he had no interest in anything. He had no visits with friends or relatives. He went shopping, to the post office, and to the bank once or twice a month.

Plaintiff stated that he used to be outgoing, such as walking at the park. He didn't like people very much, stating the "only thing I like is taking care of my parents." He said he had problems concentrating and was not very good in school.

On May 7, 2004, Plaintiff told staff at the Summit Center that he had maintained sobriety for seven months, but continued with mood instability and anxiety issues. He continued to require psychiatric and therapy services to aid in his management of symptoms and support his efforts to abstain from substance abuse.

On May 27, 2004, Plaintiff was examined by Kip Beard, M.D. for the State Disability Determination Service (R. 222). Plaintiff's chief complaint was encephalomacia, right leg and knee problems, and history of pancreatitis. He complained that his right hand worked slower than his left,

and his right leg felt weaker than the left. He said he had had no alcohol in eight or nine months. Plaintiff told Dr. Beard that in 2001 he twisted his right knee and it popped out. He was prescribed a knee brace. He had pain and swelling and was found to have a DVT. He was treated with Coumadin, but was unable to afford to continue it. Nevertheless, he had not had any recurrent blood clots. He complained of some ongoing right knee pain described as an ache with stiffness. At times his right calf hurt and swelled up if he was on the leg for a period of time.

Plaintiff told Dr. Beard his parents were both ill. His father was bedridden and his mother was nearly bedridden and he was the only care provider for them. He said he had difficulty meeting their needs and did not have much support. He had difficulty transferring his father because of the right knee problems. He had not been using the knee brace lately.

Upon examination Dr. Beard noted some right facial weakness and some mouth drooping on the right (R. 224). Plaintiff could stand unassisted and ambulated normally. He had a very mild degree of difficulty arising from a seat or stepping on or off the examining table with knee discomfort. His legs had no clubbing, cyanosis, edema or evidence of peripheral vascular insufficiency or chronic venous stasis. Plaintiff could write with his dominant (left) hand without difficulty. He could pick up a coin with either hand, but had a very mild degree of difficulty on the right. There was some very subtle systonic posturing of the fourth and fifth fingers and a mild degree of incoordination on the right side for fine manipulation. His knees had some slight bilateral crepitation and anterior laxity. There was some mild medial joint line prominence of the right knee and some tenderness of the right knee without redness, warmth or swelling. Range of motion was normal.

Neurological examination revealed right facial weakness and some subtle distal right arm and

leg weakness at about 4.5/5 each. He could heel and toe walk. He seemed to have some diminished elevation for heel and toe walking on the right. He could tandem walk without difficulty, and had a mild degree of difficulty arising from a squat.

Dr. Beard diagnosed remote motor vehicle accident with closed head injury with possible posttraumatic encephalomacia with mild right hemiparesis; pancreatitis; prior history of chronic alcohol abuse; right knee strain with chronic right knee pain; and history of right DVT, resolved.

A May 27, 2004, x-ray of the right knee was normal (R. 227).

On June 3, 2004, Licenced Psychologist Tina Yost completed a Psychological Evaluation of Plaintiff for the State agency (R. 229). She noted Plaintiff "stammeringly responds the reasons for seeking benefits as his 'family situation.'" He was "somewhat indirect and overelaborative in providing his presenting symptoms." He wanted to discuss his family situation and living arrangements. He said his father was unable to care for himself, so Plaintiff "must care for him." He also had to help his mother due to her health problems. He also reported financial difficulties. He experienced anxiety, but "not so much since I been on Lexapro." He reported difficulty controlling his worries, but stated the medication helped. He'd been told he worried too much. He reported some mildly obsessive-compulsive behaviors that also decreased since beginning Lexapro. Symptoms of depression had also lessened.

Upon Mental Status Examination, Plaintiff was dressed casually but appropriately. His attitude was cooperative and he was socially within normal limits. Speech was normal and ability to communicate was adequate. He was fully oriented. His mood was somewhat depressed and his affect was somewhat bland. His thought process was slightly tangential. His insight appeared low average as did his judgment. He reported no suicidal or homicidal ideation. His memory was within

normal limits, his concentration was within normal limits, and his psychomotor behavior was unremarkable.

Plaintiff reported his daily activities as follows:

> The claimant typically awakens at 4:00 a.m. to care for his father. He checks his father's glucose level, gives him insulin, feeds him Ensure at 5:00 a.m. through a feeding tube, and shaves the father. An aid comes into the home between 11:00 a.m. and 2:00 p.m. to help bathe the claimant's father. The claimant spends most of the day caring for his father; cleaning around his father's feeding tube, performing oral hygiene for his father, checking the father's catheter, glucose levels, etc. He states he also tries to prepare meals for his mother. He does the housework and laundry. He states he had never really had any hobbies, with the exception that for a period of time he obtained a membership at the gym, but he states sometimes he would walk in and then walk right back out again without even lifting. He states he feels uncomfortable around other people and other people "never really did interest" him.

(R. 232).

Dr. Yost found Plaintiff's concentration, persistence and pace all within normal limits, and his memory within normal limits. She diagnosed alcohol dependence, early full remission; major depressive disorder, under control with medication; anxiety disorder, NOS, under control with medication; nicotine dependence; schizoid traits; and history of head trauma with mild right-side hemiparesis. She opined his prognosis was fair, with appropriate treatment.

On July 22, 2004, State agency reviewing psychologist Joseph Kuzniar Ed.D., completed a Psychiatric Review Technique ("PRT"), opining that Plaintiff did not have a severe impairment, although he did have an affective disorder and anxiety related disorder (R. 234). He opined Plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and had no episodes of decompensation, each of extended duration (R. 244).

On July 24, 2004, State agency reviewing physician Fulvio Franyutti completed a Physical

Residual Functional Capacity Assessment ("RFC") opining that Plaintiff could occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk about 6 hours in an 8-hour workday; and sit about 6 hours in an 8-hour workday (R. 250). He should never climb ladders, ropes or scaffolds, or crouch or crawl, but could occasionally perform all other posturals. He should avoid concentrated exposure to temperature extremes.

On November 9, 2004, Plaintiff completed a "Disability Report" form, stating that the conditions that limited his ability to work were encephalomalacia, depression, right leg problem, and pancreatitis (R. 75). Where asked specifically how his illnesses, injuries or conditions limited his ability to work, Plaintiff stated: "My knee hurts when I walk. I have trouble being around people. I have trouble with focus and concentration."

Plaintiff stated the conditions first bothered him in 1980, but he became unable to work in February 2001. Before he actually quit his job, his illnesses, injuries or conditions did not cause him to work fewer hours or change his job duties. Where asked why he stopped working on February 27, 2001, Plaintiff stated: "I got fired."

Plaintiff also completed a "Personal Pain Questionnaire," stating he had pain in his leg and lower belly (hernia) (R. 87). The pain was caused or made worse by "pulling my dad over in bed. With leg: walking such as going to store or driving half hour." He was taking no pain medication. He also complained of pain in his leg and foot swelling when he walked around the house. Plaintiff also said he sometimes had headaches from having been hit by a car when he was two and a half.

Plaintiff also completed a "Function Report" (R. 92). He described his daily activities as follows:

> My day starts anywhere from 1-3 in the morning hours. My father is 82 and bedfast so I get up early and take care of him. He has no gag reflex so I suction him out. He has a feeding tube. His first feeding is due also I empty his urine bag. My mother

is 73 and really ill herself so I do as much as I can to help her.

Plaintiff stated he took care of his father and mother, and he had the help of an aid three hours per day to help bathe his father (R. 93). He had no problems with his own personal care but sometimes his nerves were so bad he had a hard time getting to sleep. He prepared his own meals, but was no longer able to make "full course meals." He did the laundry, washed dishes, and took out the garbage. He went to the store twice a month, for about an hour each time. He said he could not count change but could pay bills and handle banking "with the help of a calculator." When he went to the store his mother gave him a check. He said he used to be able to count change in his head. He said he had no hobbies or interests. He used to "like to go to the park and run have not done this in about 12 years." He spent no time with other people and did not like people too much except for his mother and dad (R. 97). He used to be social about 12 years ago, when he used to go to a gym, and liked to work with people. Plaintiff said lifting was affected by his hernia and his leg got stiff when walking or driving.

Plaintiff also stated:

As I said my father has been bedfast 7 yrs. My mother has been getting more ill every day. I quit work three yrs ago to take care of them but even before then I would work and take of them . . . .

(R. 106).

On November 9, 2004, Richard Southall, an evaluator with United Summit Center, completed a review assessment of Plaintiff (R. 258). He found that Plaintiff was experiencing depressive symptoms including lack of interest, lack of energy, feelings of hopelessness and helplessness, and severe withdrawal behaviors. He said he had not improved much in the past few weeks, but that the medication was helping. He was "still unemployed and is not looking for work because of his caretaking responsibilities toward his elderly parents."

Upon examination, Plaintiff was fully oriented and expressed no suicidal or homicidal ideation. His demeanor was initially withdrawn, but as the session progressed, he became more animated.

On January 11, 2005, State agency reviewing psychologist Frank Roman, Ed.D. completed a PRT, opining that Plaintiff had an affective disorder and anxiety-related disorder, but that neither was severe (R. 367). His anxiety and depression were both controlled with medications. He had a mild restriction of activities of daily living, mild difficulties maintaining social functioning, mild difficulties maintaining concentration, persistence or pace, and had had no episodes of decompensation, each of extended duration.

On January 13, 2005, State agency reviewing phsycian Thomas Lauderman, DO completed an RFC, opining Plaintiff could lift/carry 50 pounds occasionally; 25 pounds frequently; stand/walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. He had no other limitations. He found Plaintiff partially credible, in that exam showed some crepitus, tenderness, and weakness that could cause mild difficulties with activities, "but certainly not to the extent alleged."

On February 4, 2005, Plaintiff completed a "Disability Report--Appeal" form, stating that his hernia had gotten worse, his depression was deeper, his nerves were worse, his leg swelled up as well as his foot, his knee "wants to lock up" and his leg hurt when walking (R. 110). He also reported a new limitation of shoulders and ankle hurting.

On February 22, 2005, Plaintiff presented to a new doctor, Dana Bragg, M.D. for complaints of pain in both shoulders, occasional right leg swelling and ache, anxiety/depression, and pain in inguinal area (R. 403). Dr. Bragg found he had tenderness over both shoulders to palpation, and diagnosed right inguinal hernia; anxiety/depression; status post DVT right leg; and bursitis.

19

Plaintiff presented to Dr. Bragg on May 24, 2005, with complaints of both shoulders hurting, worse when reaching up (R. 402). Plaintiff told the doctor he had gotten a medical card. He also quit going to the Summit Center and stopped taking Lexapro because he said it made him suicidal. The doctor found Plaintiff had a flat affect and depressed mood. He diagnosed inguinal hernia, anxiety/depression, bilateral shoulder pain, and tobacco dependence. He ordered bilateral shoulder x-rays which were done and assessed as normal (R. 407).

Sometime in June 2005, Plaintiff began seeing psychologist Charles Green, M.S., upon referral of his family physician "because of symptoms of depression and anxiety" (R. 393). Plaintiff initially complained about feeling depressed, including decreased energy, constricted interests, sleep difficulties, poor concentration, feelings of hopelessness, feelings of guilt, and problems with restlessness and anxiety. He related suicidal ideation without plan. He saw Mr. Green only twice initially, however, believing he could control his depression and anxiety with medication alone.

On July 6, 2005, Plaintiff presented to Dr. Bragg for complaints of anxiety and erectile dysfunction (R. 400). He said that Paxil was helping, but he still had days when he felt anxious. Viagra was helping the ED. The doctor found Plaintiff's mood and affect improved, and diagnosed anxiety/depression, tobacco dependence, history of DVT, and ED.

On September 13, 2005, Plaintiff presented to Dr. Bragg for complaints of not being able to sleep – "never even tired out" (R. 399). The doctor noted Plaintiff exhibited "flight of ideas." He diagnosed anxiety/depression, history of DVT, and tobacco dependence.

On October 5, 2005, Plaintiff presented as a "new patient" to Psychiatric Associates for reports of depression and anxiety (R. 396). Plaintiff reported he was hit by a car at age two, suffering head trauma. His father had died during the past year, and he was now caring for his mother. He reported no suicidal or homicidal ideation. Upon Mental Status Examination, Plaintiff appeared

anxious. He was fully oriented. His speech was normal. His emotional expression was dysphoric. The assessment was major depression recurrent; anxiety disorder NOS; and alcohol abuse in past. His GAF was 60.[6]

On November 3, 2005, Plaintiff returned to Psychiatric Associates for follow up (R. 395). He reported he was doing well. His mood was better. His appearance was calmer and his affect was better. He was found to be in partial remission.

On November 8, 2005, Plaintiff presented to Shiv Navada, M.D. for a neurologic consultation for his complaints of headaches (R. 412). Plaintiff told Dr. Navada he was hit by a car at age 2 ½ and had had a subdural hematoma and was paralyzed on the right side for three days. He said he subsequently did well. He said he was found to be uncoordinated while in Basic Training at age 19, and was discharged. "He has spent much of his life looking after his elderly parents." He reported having dull left-sided headaches once a week or so for the last two or three years, with more severe pain in the same area once a week. He took over-the-counter medication. He reported being nervous and anxious, and feeling sometimes as if "his energy meter has run out." At other times he felt like curling up in bed. He said his vision tended to become fuzzy and he had difficulty driving at night. His past history was listed simply as "asthma." He reported "no alcohol use."

Upon examination, Plaintiff was alert. He knew the day, month and year, but could not describe recent news events. He could not perform serial 7's or interpret proverbs. Dr. Navada found his affect "strange." His attention, concentration, language, and memory were all normal. He had a slightly wide based gait with some trouble tandem walking. He had mild dysmetria on finger

_____

[6]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

to nose and heel to knee testing. Dr. Navada diagnosed mixed headaches, late effect of head trauma, anxiety/depression, and low normal intelligence. He believed Plaintiff had components of tension and vascular headaches, but did not feel his symptoms were severe enough to warrant any drug therapy. He did refer Plaintiff for an EEG for his other symptoms. He noted Plaintiff had some clumsiness which he presumed were residual effects of the head injury, but still wanted to further evaluate this with an MRI. He also felt some symptoms might be psychiatric.

The MRI showed no evidence for diffusion abnormalities, no mass effect, no midline shift or hydrocephalus, no blood breakdown products, no abnormal enhancement, and no abnormal extra-axial fluid (R. 415). There were bilateral sinus mucus retention cysts, but the study was otherwise unremarkable.

The EEG was also "essentially normal" (R. 416).

On December 1, 2005, Plaintiff returned to Psychiatric Associates for a follow up (R. 394). He reported he missed his father during the holidays. His mood was fair and his anxiety was worse. He was not sleeping well and was worried about his mother's health. His appearance was anxious and his emotional expression was fair. He was still found to be in partial remission, with worse anxiety.

On December 14, 2005, Plaintiff presented to Dr. Bragg for complaints of difficulty urinating (R. 401). He wanted his prostate checked. He told Dr. Bragg that neurologist Dr. Navada had found nothing wrong with him. Plaintiff stated he was now seeing a psychologist. He was diagnosed with anxiety/depression, history of DVT, and tobacco dependence.

On December 20, 2005, Plaintiff presented to Dr. Navada for a follow up (R. 411). Plaintiff said he had been doing fairly well, but still with "some dull frontal headaches at times." He said he had trouble tolerating his psychiatric medications, and reported he was doing better on Lorazepam

and Paroxetine.

On examination Plaintiff was alert and oriented. He had a tendency to jump from one topic to another, but seemed comfortable. He had some giveaway weakness of the left hand, but cranial nerves were intact. Dr. Navada diagnosed mixed headaches, anxiety, and smoking. He opined that no drug therapy was required because Plaintiff's headaches were relatively mild. He noted the MRI was unremarkable except for sinus mucus retention cysts. The EEG was normal, and blood tests were normal. Dr. Navada therefore discharged plaintiff from his care.

On January 16, 2006, psychologist Charles Green wrote a letter regarding Plaintiff's treatment (R. 393). He noted that Plaintiff had initially attended two sessions, became uncomfortable, and did not return for five months. Plaintiff had hoped medication alone would be enough, but found the process of med checks too abrupt and dismissive and decided to retry therapy. He had at the time of the report attended nine therapy sessions.

For history, the psychologist noted that Plaintiff "suffered severe head trauma as an infant and has had some learning and coping problems much of his life." He reported that his childhood injury had a direct impact on his being discharged from the Army. His concerns/doubts relative to acceptance and rejection left him very tentative when it came to new situations and people. He reported growing up in a home filled with argument and strife, yet found himself settled in his parents' home, becoming their primary caretaker. Life constriction and depression worked hand in hand "and it is hard to tell which came first."

Plaintiff had initially complained about feeling depressed, including decreased energy, constricted interests, sleep difficulties, poor concentration, feelings of hopelessness, feelings of guilt, and problems with restlessness and anxiety. He related suicidal ideation without plan. Mr. Green diagnosed major depressive disorder; personality disorder, NOS, with co-dependent features; history

23

of brain injury; and severe psychosocial stressors including problems with primary support group, economic problems, and housing problems. He rated his GAF at 58.[7]

The administrative hearing was held on January 23, 2006 (R. 441). During the hearing, Plaintiff testified that his father had passed away a year earlier, but he still cared for his 74-year-old mother (R. 446). He and his mother had moved about seven months earlier. When asked why they had moved, Plaintiff testified:

> Well, sir, my father had passed away January 27 of '05. The landlord wanted to up the rent to 500 a month when my mother is only receiving $621 a month, which I explained to [the landlady] as a courtesy, but she wouldn't give us time. So we had to do something. We had to move . . . . So we moved into a small trailer, a 14' x 70' trailer located up - - just a couple of blocks up the road which was convenient with, you know, the money wise.

(R. 446). Plaintiff testified he took care of his mother the best he could. When asked what his mother's problems were, he testified:

> Well, sir, currently she has cataracts, COPD which is a coronary pulmonary disease. She had emphysema, chronic fatigue syndrome. She's about 100 pounds and about 5'1". 5'2". Sometimes she gets up shaky. She can hardly stand. So I need to be there . . .

(R. 446). When asked what he helped his mother with, Plaintiff testified:

> Well, when I get - - during the day I'll ask her if she needs some breakfast and I can fry up some eggs, make a sandwich, get her some coffee....I do the shopping, but it's about the main items every other week. Now, I go shopping about every two weeks or as needed. As far as cooking is concerned, it's something I can stick in the oven and turn on to a certain temperature or maybe open a can of soup. Both of us eat very conservatively. As far as cooking goes, no, I can't cook. I can heat stuff up. Excuse me. So I like to get her fed, you know. And as long as she is comfortable, then I'm comfortable. I don't like to see her with cataracts. I mean, she has some extreme bad headaches. She's worried about me, of course, and I worry about her.

---

[7]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

When asked why his mother did not have cataract surgery, Plaintiff testified:

> I have been trying to tell her that I would like to see her go see if they're operable or not. There is a surgeon here in Clarksburg I think is pretty good. His name is Dr. Thumb. I have been after her, but she said about a month ago she wants to wait and see what happens with me. Now, I don't know what she meant. Maybe later on in my life, today. I don't know. But she doesn't like to worry me and it really flabbergasts me sometimes just to see her having real severe headaches . . . .

Plaintiff also testified that he quit work in March 2001, because of his dad and his own illnesses. Regarding his father, he testified:

> And, of course, I had - - the last year of his life, I had aides and attendants that the VA - - since he was qualified - - classified as a VA outpatient, the VA allotted interim health care to come over three hours a day, but there was a lot of things they weren't allowed to do. They couldn't even feed him. Now, March 2001 is when I quit work and I did so because of my dad and the illnesses that have come up on me. That's when they put the feeding tube in my father. And they couldn't even feed him with just the . . . And they couldn't do any wouldn't care for the wound he had in his stomach. They couldn't do that. All they could do is help him with bathing. They wouldn't shave. So it didn't really give me a break to do anything.

The ALJ entered his decision finding Plaintiff not disabled on February 24, 2006 (R. 22).

**Evidence to Appeals Council**

One month after the ALJ's decision, on March 29, 2006, Plaintiff presented to Marc W. Haut, PhD for a neuropsychological evaluation. On April 18, 2006, Plaintiff's representative sent new evidence to the Appeals Council, which consisted of the report of that evaluation (R. 438). In his report, Dr. Haut noted the evaluation was at the request of Plaintiff's psychologist, Charles Green, "to clarify his current cognitive functioning." Plaintiff described his childhood accident to Dr. Haut as having been hit by a car with loss of consciousness followed by coma. He said he was hospitalized for a month. He said he had a subdural hygroma as well as subarachnoid hemorrhage. He reported right hemiparesis since the accident. The doctor noted Plaintiff's MRI was normal. Plaintiff was not presently working but previously worked as a cashier and clerk. Plaintiff reported

difficulty running the register, however, because of his hemiparesis. He reported "a previous history of alcohol use but none at the present time." He acknowledged symptoms of depression with sleep/appetite disturbance, reduced self-esteem, feelings of hopelessness and helplessness, as well as suicidal ideation. He said he had a suicide attempt in the past but no intent or plan now.

Plaintiff was reportedly pleasant and cooperative throughout the evaluation. His effort was good, as was attention to task, although he showed some fatigue later in the day. He was clearly talkative, tangential, and hyper. He required redirection throughout the interview. His awareness of social cues was reduced. He had mildly inappropriate social behavior. His performance was considered valid and not embellishing.

Plaintiff showed decreased grip strength on the right. Rapid alternating movements were slowed on the right and distal coordination was severely impaired on the right. He could learn a new motor sequence with his left hand, but was awkward with the right. Plaintiff was left-handed. His spontaneous speech was fluent but tangential and often devoid of content.

Dr. Haut concluded that the results of the neuropsychological evaluation revealed a pattern of cognitive deficits consistent with a severe traumatic brain injury as a child. Plaintiff showed residual right hemiparesis and prominent difficulties with processing, attention, and other frontal lobe skills. His memory was impaired, he failed to develop appropriate social skills, and had limited coping skills and ability to modulate his affect. Dr. Haut believed most of the behavior problems were attributable to the head injury. "Certainly, his problems with interpersonal relationships have been compounded as he failed to learn and thrive since then."

Plaintiff told Dr. Haut he was applying for disability (R. 439). Dr. Haut therefore commented on the Social Security criteria and Plaintiff's qualifications for disability, finding Plaintiff met Listing 12.02 for an organic mental disorder. He based this finding on Plaintiff's history of a closed

head injury with residual right hemiparesis. He found that, as a result, Plaintiff had deficits with memory, personality, emotional lability, and problems with higher intellectual functioning. He found as a result of these problems, that Plaintiff had moderate problems with activities of daily living, marked difficulty maintaining social functioning, frequent problems maintaining consistency and pace, and repeated deterioration in a work-like setting. (This finding was based on the doctor's observations during the interview of Plaintiff's repeated need for redirection and focusing with his conversation.)

Dr. Haut opined that Plaintiff had the ability to learn new information if presented in an organized verbal format.

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and disability insurance benefits set forth in Section 216(i) of the Social Security Act so as to be insured for such benefits throughout the period at issue herein, i.e., since February 27, 2001.

2. The claimant has not engaged in substantial gainful activity during the period at issue (20 CFR §§ 404.1520(b) and 416.920(b).

3. During the period at issue, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited his ability to perform basic work activities for a period of at least 12 consecutive months: residual effects, status post right knee strain; history of right deep venous thrombosis, resolved; history of pancreatitis; residual effects, status post (childhood) head trauma; depressive disorder, not otherwise specified ("NOS"); anxiety-related disorder, NOS; and history of alcohol abuse/dependence (20 CFR §§ 404.1520(c)and 416.920(c)).

4. During the period at issue, the claimant has had no medically determinable impairments, whether considered individually or in combination, that have

presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in Appendix 1, Subpart P, Regulation No. 4 (20 CFR §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     Throughout the period at issue and independent of the impact of any intermittent alcohol use/abuse, the claimant has had the residual functional capacity to perform at least a range of work that: requires no more than a light level of physical exertion; affords an opportunity for a brief, one-to-two minute change of physical position at least every thirty minutes; requires no more than occasional balancing, kneeling or stooping, or climbing or ramps or stairs; requires no crawling or crouching, or climbing of ladders, ropes or scaffolds; entails no exposure to temperature extremes or to workplace hazards (e.g., dangerous moving machinery, unprotected heights, etc.); entails no complex or detailed instructions; requires no close concentration or attention to detail for extended periods; and accommodates up to one unscheduled workday absence per month (20 CFR §§ 404.1520(e) and 416.920(e)).

6.     Throughout the period at issue, the claimant has remained capable of performing his vocationally relevant past work as a clerk/cashier.  That job requires the performance of no work-related activities that exceed his prescribed residual functional capacity (20 CFR §§ 404.1565 and 416.965).

7.     The claimant has not been under a "disability," as defined in the Social Security Act, at any time during the period at issue herein, i.e., since February 27, 2001 (20 CFR §§ 404.1520(f) and 416.920(f)).

(R. 20-21).

## IV.  Contentions

A.     Plaintiff contends the Administrative Law Judge's conclusion that he can perform his past relevant work is not supported by substantial evidence for several reasons:

1.     The ALJ's finding that Plaintiff's past relevant work as a clerk/cashier was within his functional ability is not supported by substantial evidence; (in particular the Court should not place great emphasis on Plaintiff's own statements and testimony at the hearing that he quit his job to take care of his parents).

2.     The ALJ failed to determine whether Plaintiff's past relevant work was substantial gainful activity;

3.     The ALJ's Residual Functional Capacity assessment ("RFC") is not

28

consistent with his conclusion that Plaintiff suffered from severe mental impairments; and

4.  Evidence to the Appeals Council shows that the limitations from Plaintiff's childhood head injury are more significant than the ALJ found.

B.  Defendant contends substantial evidence supports the ALJ's finding that Plaintiff could perform his past relevant work because:

1.  Plaintiff not only acknowledged he left his job at Rollins Market because he had to take care of his elderly and ill parents, but he consistently so stated numerous times to physicians, psychologists, and therapists;

2.  Plaintiff acknowledged that at least his job as clerk/cashier at Rollins Market was past relevant work, and concedes that at least that one job was performed for at least one year at the SGA level;

3.  The fact that the ALJ found Plaintiff had "severe" mental impairments that cause a "significant limitation" means only that the impairments may result in a "minimal effect " or are more than a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work . . . ;" and

4.  Plaintiff's argument that Dr. Haut's report, obtained more than a month after the ALJ's decision, requires remand, is without merit.

## V. Discussion
## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case

before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984)(quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Past Relevant Work

### 1. Plaintiff's Testimony Regarding Caring for Parents

Plaintiff argues that substantial evidence does not support the ALJ's conclusion that Plaintiff could perform his past relevant work as a clerk/cashier. Plaintiff concedes that he testified at the hearing "that the reason he could not work was that he provided care for his aged and infirm parents." (Plaintiff's brief at 7). Plaintiff then argues, however, that "the Court should not place great emphasis on this testimony for two reasons:" 1) Plaintiff suffered from such a severe alcohol dependency problem that "his ability to provide significant care of his parents is questionable;" and 2) The issue in Plaintiff's claim is "whether he suffers from medically determinable physical or mental impairments that prevent him from working, not what reasons he gives for not working." (Plaintiff's brief at 8).

It is undisputed that Plaintiff had a problem with alcohol starting from at least June 2000. At that time he stated he had started drinking three months earlier due, in part, to increased stress associated with taking care of his mother and father who were both elderly invalids. Plaintiff himself, however, consistently stated that his drinking consisted of "impulsive and binge drinking," and the evidence supports this. In other words, there is no evidence Plaintiff continuously drank or continuously stayed drunk, and no evidence that his drinking was disabling. Further, Plaintiff was

working during this time, although perhaps not at levels considered SGA.

On the other hand, Plaintiff also testified that he was almost solely responsible for the care of his elderly, bedridden, terminally ill father who also suffered from dementia, and his elderly, ill mother. In November 2001, Plaintiff told his doctor he quit working "due to the fact that he wanted to take care of his invalid father." On December 4, 2001, Plaintiff referred to himself as "unemployed," but told a doctor he was not bothered by the situation, stating he was not working because he was taking care of his father who had severe medical problems. On January 12, 2004, Plaintiff told his doctor he could not hold a stable job because he had to take care of everybody else. On March 4, 2004, Plaintiff's doctors noted he was not currently working and was "taking care of his parents and has been taking care of them since 2001." Under "History of Present Illness," Plaintiff's doctor wrote:

> He takes care of his father who is basically bedridden. He would not put him in a nursing home because of his feelings about nursing homes. He quit work in 2001 and his wife left in 2001, so he has been under stress for both reasons.

On April 21, 2004, Plaintiff stated that both his parents depended on him for care. On May 27, 2004, Plaintiff told Dr. Beard his father was bedridden and his mother nearly bedridden and he was the only care provider for them. On June 3, 2004, Plaintiff told psychologist Yost that his reason for seeking benefits was his "family situation." He told her his father was unable to care for himself, so Plaintiff "must care for him," as well as his mother, who also had health problems. Plaintiff's reported daily activities included spending most of the day caring for his father, including cleaning his father's feeding tube, taking care of his oral hygiene, checking his father's glucose levels and catheter, and feeding him. He prepared simple meals for his mother and himself, and did the housework and laundry.

Again in November 2004, Plaintiff stated his day started anywhere from 1-3 in the morning;

31

that his father was 82 and bedfast; and that his reason for getting up so early in the morning was to take care of him– suctioning him out, emptying his urine bag, and caring for his feeding tube. He also did as much as he could for his mother because she was 73 and "really ill herself." He said he did the laundry, washed dishes, took out the garbage, went to the store twice a month, and handled banking and bills (but only "with the help of a calculator.") Plaintiff stated:

> As I said my father has been bedfast 7 yrs. My mother has been getting more ill every day. I quit work three yrs ago to take care of them but even before then I would work and take care of them . . . .

On November 9, 2004, a physician noted that Plaintiff had told him he was still unemployed and was not looking for work "because of his caretaking responsibilities toward his elderly parents."

Although Plaintiff raises the issue that his own mother had him committed and charged with battery, it is also significant that when Plaintiff was referred to MICA, it was discontinued "as his mother requested he come home to help take care of his father."

The above evidence and Plaintiff's own statements and testimony substantially support the ALJ's finding that Plaintiff stopped working to take care of his elderly, invalid parents and remained unemployed not due to disability but due to his self-imposed caretaking responsibilities.

## 2. Past Relevant Work as Substantial Gainful Employment

Plaintiff next argues the ALJ failed to determine whether his past relevant work was substantial gainful activity ("SGA"). Sections 404.1520(e) and 416.920(e) of the Regulations provide:

> Your impairment must prevent you from doing past relevant work. If we cannot make a decision based on your current work activity or on medical facts alone, and you have a severe impairment, we then review your residual functional capacity [RFC] and the physical and mental demands of the work you have done in the past. If you can still do this kind of work, we will find that you are not disabled.

Sections 404.1565(a) and 416.965(a) of the regulations provide as follows: "We consider that your

32

work experience applies when it was done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity [SGA]." Plaintiff started working for "Roger Mazzei & Maine, Inc." as a clerk/cashier sometime in 1997 (R. 59). His income record shows he earned $7,050.00 from that job during that year. He also worked at a McDonald's that same year, earning an additional $4,038.00 as a food preparer. He continued to work at McDonald's in 1998, then at the Rollins Market (the same store as was earlier owned by Mazzei & Maine, Inc.) again in 1999-2000. It is true that Plaintiff's reported income for the years 1998, 1999, and 2000, does not reach that which is presumptively considered substantial gainful activity. The undersigned finds, however, that substantial evidence supports a finding that Plaintiff had substantial gainful activity in at least 1997, which is within the relevant 15 year time frame, and that he worked at that job long enough to learn it. In fact, Plaintiff concedes his earnings show that he performed substantial gainful activity in 1997. Plaintiff seizes on one sentence of Social Security Ruling ("SSR") 82-62, which provides "An individual who has worked only sporadically or for brief periods of time during the 15-year period, may be considered to have no relevant work experience." (Emphasis added). Although the earnings record shows Plaintiff did not make much money during the years 1997 through February 2001, when he quit working to take care of his parents, the same evidence does not indicate he worked only "sporadically or for brief periods of time" over those years. He worked for the same two employers, McDonald's and/or the Rollins Market, in 1995, 1996, 1997, 1998, and 1999, earning $6,447 for 1996, $11,089 for 1997, $3859 for 1998, and $2585 for 1999. The record shows he then earned $6674 for 2000 while taking care of his parents full time, and $2095 for 2001, when he quit in February of that year because, as he stated, he could not handle working full time and taking care of his parents at the same time.

The Evaluation Guides under § 404.1574, are, as named, only "guides" to what may

constitute SGA. In 1997, for example, average monthly earnings of $500.00 "may show that you have done substantial gainful activity." Under this presumption, Plaintiff had SGA, solely from Rollins Market, in 1997. For this reason alone the undersigned finds Plaintiff had past relevant work consisting of substantial gainful activity within the past 15 years. Plaintiff, however, notes his work at the Rollins Market in other years did not reach the amount to be considered SGA. In 1998, he earned $2,585, and in 1999, he earned $5,376 (plus $1,297 from another employer). While the 1998 amount does not presumptively equal SGA, the 1999 (from Rollins Market alone), while not above the amount presumptively equaling SGA, is substantially higher than the amount "that will ordinarily show that you have not engaged in substantial gainful activity" 404.1574(b)(3). In other words, it is between the amount that presumptively shows one has performed SGA and the amount that presumptively shows one has not.

The undersigned therefore finds there is substantial evidence that Plaintiff did have "past relevant work experience," as a clerk/cashier as found by the ALJ.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work that afforded an opportunity for brief change of physical position at least every 30 minutes; requires no more than occasional balancing, kneeling stooping or climbing of scaffolds; entails no temperature extremes or workplace hazards, dangerous moving machinery or unprotected heights; entails no complex or detailed instructions; requires no close concentration or attention to detail for extended periods; and accommodates up to one unscheduled workday absence per month.

The ALJ referenced Exhibit 9E in making his finding that Plaintiff could perform his past relevant work as it was performed. Exhibit 9E is Plaintiff's own description of his work as a clerk, described as entailing no use of machines, tools, equipment, technical knowledge, or writing reports; no supervising other people; a heaviest weight lifted of 20 pounds; and standing eight hours per day,

but no walking, sitting, climbing, stooping, kneeling, crouching, writing or handling. Plaintiff also described his work at the Rollins Market in his testimony at the Administrative hearing, where he stated he did not have to lift anything, and was able to sit down on a stool "quite a bit" (R. 472). He could basically sit or stand whenever he wanted, in between customers. There was "only a slight bit of things [he] had to do in the meantime, like the lottery machines, putting up cigarettes, et cetera, what you usually do in a small convenience store" (R. 472). The VE testified that Plaintiff's work at the Rollins Market was light and unskilled (R. 475).

The undersigned finds that substantial evidence supports the ALJ's determination that Plaintiff could physically perform his past relevant work as he performed it at the Rollins Market.

### 3. Mental Impairments

Plaintiff next argues that the ALJ did not include all of his mental limitations in his residual functional capacity assessment ("RFC"). He cites SSR 82-62, stating, "care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g., speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work." The undersigned finds the Plaintiff's own descriptions of his job duties at Rollins Market, as stated above, were sufficient for the ALJ to determine that that job did not have any requirements outside Plaintiff's RFC.

Plaintiff, however, particularly raises an argument that is new to this magistrate judge, as follows:

> The Administrative Law Judge found that Mr. Reese suffered from severe mental impairments: residual effects, status post (childhood) head trauma; depressive disorder, not otherwise specified; anxiety related disorder, not otherwise specified; and history of alcohol abuse/dependence. (Plaintiff's brief at 10).

The Commissioner, in her regulations, provide[] that a severe impairment imposes significant limitations in the claimant's ability to perform "basic work activities." 20 C.F.R. 1 404.1521(a). (2005). Examples of basic mental work activities are 1) understanding, carrying out, and remembering simple instructions; 2) use of judgment; 3) responding appropriately to supervision, co-workers and usual work situations; and 4) dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b)(3)-(6) (2005). Because he found that Mr. Reese suffered from severe mental impairments, the Administrative Law Judge necessarily found that the claimant was significantly limited in some of the basic work activities listed in 20 C.F.R. § 1521(b).

Despite finding that Mr. Reese suffered from a number of severe mental impairments, the Judge included only an inability to perform complex or detailed instructions and an inability to perform close concentration or attention to detail for extended periods in his residual functional capacity assessment . . . . A severe mental impairment would cause a significant limitation in the ability to perform simple as well as detailed or complex instructions.

Defendant argues that notwithstanding the "significant limitation" language in the regulations, an impairment or impairments can be found not severe and a finding of no disability made at step two of the sequential evaluation process only if the impairments result in only a minimal effect on the individual's ability to perform basic work activities. The undersigned agrees with Defendant.

To understand the difference between Plaintiff's and Defendant's arguments, the undersigned finds a brief review of the background of the so-called "severity regulation" is in order. In 1968, the Secretary (now "Commissioner") issued amended regulations which provided, in pertinent part:

Medical considerations alone can justify a finding that the individual is not under a disability where the only impairment is a slight neurosis, slight impairment of sight or hearing, or other slight abnormality or a combination of slight abnormalities.

(Emphasis added). Under the 1968 regulations, therefore, a claimant whose medical condition was not merely a "slight abnormality" would continue to the next step in the evaluation. In 1978, however, the Secretary issued new regulations, modified in 1980, effecting a streamlined decisional

process, provided in 20 CFR § 1520. The "severity" test under 20 CFR § 404.1520(c), is that quoted by Plaintiff:

> If you do not have any impairment or combination of impairments <u>which significantly limits your physical or mental ability to do basic work activities</u>, we will find that you do not have a severe impairments and are, therefore, not disabled . . ..

(Emphasis added). Further, 20 CFR § 404.1521(a) provides:

> An impairment or combination of impairments is not severe if it does not <u>significantly limit your physical or mental ability to do basic work activities</u>.

(Emphasis added).

In reviewing the Commissioner's determinations pursuant to the "new" regulations, different courts applied different standards in construing the term "severe." While many courts construed the term "nonsevere" solely in terms of the language found in 20 CFR § 404.1521(a) enacted in 1978, other courts, including the Fourth Circuit, construed the 1978 regulation in light of the 1968 definition of "nonsevere" - - that is, only those abnormalities which are "slight" could be called "nonsevere." See <u>Evans v. Heckler</u>, 734 F.2d 1012(4th Cir. 1984), in which the Fourth Circuit held:

> [A]n impairment can be considered as "not severe" only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.

(Emphasis in original). The Fourth Circuit expressly quoted with approval <u>Brady v. Heckler</u>, 724 F.2d 914 (11th Cir. 1984), which stated:

> In the 1978 regulations, the Secretary stated that the definition "a medically determinable impairment is not severe if it does not significantly limit an individual's physical or mental capacity to perform basic work related functions" is a clarification of the previous regulations's terms "a slight neurosis, slight impairment of sight or hearing, or other slight abnormality or combination of slight abnormalities." It is a clarification, not a change, in the definition of severe impairment. The court, in <u>Chico v. Schweiker</u>, 710 F.2d 947 (2d Cir. 1983) reinforced the fact that the definition of severe impairment has not changed over the years.

37

The Secretary's preamble in the Federal Register reveals that the "severity" regulation, as originally promulgated in 1978, was meant to clarify the 1968 regulations' terms, "a slight neurosis, slight impairment of sight or hearing, or other slight abnormality or combination of slight abnormalities, but was not intended "to alter the levels of severity for a finding of ['} not disabled['] on the basis of medical considerations alone." 43 F.R. 55358.

The 1980 recodification stated that impairment is not considered severe if it does not significantly limit the claimant's physical or mental ability to do basic work activities. Though the regulation adds new language to the definition of severe impairment, the key point is that which was raised by the court in *Chico*; the recodification in 1980 evidenced no change in expression of the Secretary's intent as to the levels of severity need for finding of not disabled on the basis of medical considerations alone. *Chico*, 710 F.2d at 955. The court in *Jones* defined the term "significant" limitations as (1) having a meaning, (2) deserving to be considered, and (3) not meaningless. *Jones*, 555 F. Supp. At 208. The limitation must not be meaningless. This approach is, thus, identical to the 1968 language which states that the impairment must not be slight. From *Chico* and *Jones* it is clear that the 1980 regulations follow the 1968 and 1978 definition of a severe impairment.

The level of severity needed for a finding of not severe has not changed from the 1968 regulations. The 1978 and 1980 regulations follow the 1968 definition of a non-severe impairment. An impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work irrespective of age, education, or work experience . . . .

(quoting Appeals Council Review of Sequential Evaluation Under Expanded Vocational Regulations

(1980).) In the case at bar, the ALJ noted:

[T]he assessments of the State Agency's various medical consultants which were conducted in and based upon evidence available as of July 2004 and January 2004 contain conclusions in essence reflecting opinion that the claimant had no "severe," medically determinable psychological impairments and was capable of performing a range of light to medium exertional work (Exhibits 9F, 10F, 12F, and 13F). The Administrative Law Judge believes that those assessments were reasonable based upon the objective medical evidence available. However, the undersigned has accorded some benefit of the doubt in favor of the claimant and has concluded that the claimant has evidenced physical and psychological impairments throughout the period at issue which have imposed somewhat more restrictive overall functional

limitations, as described within the parameters identified above.[8]

(R. 22).

Based on all of the above, the undersigned United States Magistrate Judge finds that the ALJ's finding that Plaintiff had "severe" mental impairments in itself means no more nor less than that he had mental impairments that were "more than a slight abnormality" which had more than "such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work irrespective of age, education, or work experience." Still, the ALJ did not dismiss or fail to address the mental impairments. In fact, he found those mental impairments caused some limitations. The ALJ found Plaintiff could perform work requiring no more than a light level of physical exertion; affording an opportunity for a brief, one-to-two minute change of physical position at least every thirty minutes; requiring no more than occasional balancing, kneeling or stooping, or climbing of ramps or stairs; requiring no crawling or crouching, or climbing of ladders, ropes or scaffolds; entailing no exposure to temperature extremes or to workplace hazards; entailing no complex or detailed instructions; requiring no close concentration or attention to detail for extended periods; and accommodating up to one unscheduled workday absence per month.

For all the above reasons the undersigned finds substantial evidence supports the ALJ's RFC and his ultimate determination that Plaintiff was not disabled at any time during the period at issue, based upon the evidence before him.

### D. New Evidence to Appeals Council

Plaintiff also argues: "Lastly, the results of Dr. Haut's March 2006 neuropsychological

---

[8] The limitations as described in the ALJ's RFC.

evaluation show that Mr. Reese is more limited due to his head injury than the Administrative Law Judge indicated." (Plaintiff's brief at 11).

The ALJ entered his decision finding Plaintiff not disabled on February 24, 2006 (R. 22). On March 29, 2006, Plaintiff underwent a neuropsychological evaluation performed by Marc W. Haut, PhD (R. 438). Dr. Haut's report was then sent to the Appeals Council on April 18, 2006. The Appeals Council advised that it had considered this new evidence, but found it did not provide a basis for changing the ALJ's decision (R. 8). Plaintiff argues first that the Appeals Council was required to give some explanation when rejecting new evidence tendered after the ALJ's decision, citing Alexander v. Apfel, 14 F.Supp.2d 839 (W.D.Va. 1998); Harman v. Apfel, 103 F.Supp.2d 869 (D.S.C. 2000); and Hawker v. Barnhart, 235 F. Supp.2d 445 (D. Md. 2002).

The undersigned recognizes this issue has generated conflicting opinions in the District Courts of the Fourth Circuit. First, the regulations do not require the Appeals Council to state its rationale for denying review. See 20 C.F.R. § 404.970(b). Second, Alexander is of questionable precedential value, as it is a decision from another district, the Western District of Virginia. Third, in an unpublished opinion decided after Alexander, the Fourth Circuit specifically rejected the contention that the Appeals Council must articulate its own assessment of the additional information. See Hollar v. Commissioner of Social Security, 194 F.3d 1304 (4th Cir. 1999)(unpublished), cert. denied, 120 S. Ct. 2228 (2000) (citing Browning v. Sullivan, 958 F. 2d 817 (8th Cir. 1992), 20 C.F.R. § 404.970(b)). cf., Harmon v. Apfel, 103 F. Supp. 2d 869 (D.S.C. 2000) (court declined to follow Hollar and instead required the Appeals Council to articulate its reasoning in declining review where new evidence was submitted.). Finally, a subsequent decision in the Western District of Virginia concluded the exact opposite of the magistrate judge in Alexander. In Ridings v. Apfel, 76 F. Supp.

2d 707 (W.D. Va. 1999), which was decided after Alexander, District Judge Jones held that the Appeals Council was not required to state its reasons for finding that the new evidence did not justify review of the ALJ's decision. Judge Jones expressly disagreed with the magistrate judge's reasoning that the Appeals Council must give a detailed assessment of its failure to grant review in the face of new evidence, citing Hollar.[9]

The undersigned finds the Appeals Council did not commit reversible error by failing to explain its reasoning in determining that the evidence submitted two months after the ALJ's decision would not reasonably have changed that decision.

Despite holding that the Appeals Council was not required to articulate its reasoning for denied review, Judge Jones in Ridings affirmed the magistrate judge's recommendation that Ridings' claim be remanded to the Commissioner, because "substantial evidence [did] not support the ALJ's decision, when reviewed along with [the new evidence]." Id. at 709 (Emphasis added). In other words, the Court must consider the new evidence together with the evidence before the ALJ to determine whether the ALJ's decision was supported by substantial evidence. See also Wilkins v. Secretary, 953 F.2d 93 (4th Cir. 1991)("The Appeals Council specifically incorporated Dr. Liu's letter of June 16, 1988 into the administrative record. Thus, we must review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the Secretary's findings.") The undersigned must therefore review the record as a whole, including Dr. Haut's report.

Plaintiff described his childhood accident to Dr. Haut as having been hit by a car, with loss

_____

[9]Judge Jones did cite Alexander in a footnote, stating: "At least one other magistrate judge of this district has held that the Appeals Council must articulate some reason for finding that the new evidence does not justify review." Id. at n.6.

of consciousness followed by coma and month-long hospitalization.[10] He said he had had a subdural hygroma as well as subarachnoid hemorrhage. He reported right hemiparesis since the accident. The doctor noted Plaintiff's MRI was normal. Plaintiff was not presently working but previously worked as a cashier and clerk. Plaintiff reported difficulty running the register because of his hemiparesis.[11] He reported "a previous history of alcohol use but none at the present time." He acknowledged symptoms of depression with sleep/appetite disturbance, reduced self-esteem, feelings of hopelessness and helplessness, as well as suicidal ideation. He said he had a suicide attempt in the past but no intent or plan now.

Plaintiff was reportedly pleasant and cooperative throughout the evaluation. His effort was good, as was attention to task, although he showed some fatigue later in the day. He was clearly talkative, tangential, and hyper. He required redirection throughout the interview. His awareness of social cues was reduced. He had mildly inappropriate social behavior. His performance was considered valid and not embellishing.

Plaintiff showed decreased grip strength on the right. Rapid alternating movements were slowed on the right and distal coordination was severely impaired on the right. He could learn a new motor sequence with his left hand, but was awkward with the right. The undersigned notes that Plaintiff is left-handed. Spontaneous speech was fluent but tangential and often devoid of content.

Dr. Haut concluded that the results of the neuropsychological evaluation revealed a pattern of cognitive deficits consistent with a severe traumatic brain injury as a child. He opined that

---

[10]There is no record that Plaintiff reported this severity to any other doctors.

[11]Plaintiff did not report this limitation anywhere else in the record, including during the administrative hearing, during which he testified regarding his work as a clerk/cashier.

Plaintiff showed residual right hemiparesis and prominent difficulties with processing, attention, and other frontal lobe skills. His memory was impaired, he failed to develop appropriate social skills, and had limited coping skills and ability to modulate his affect. Dr. Haut believed most of the problems were attributable to the head injury. "Certainly, his problems with interpersonal relationships have been compounded as he failed to learn and thrive since then."

Plaintiff told Dr. Haut he was applying for disability (R. 439). Dr. Haut therefore commented on the Social Security criteria and Plaintiff's qualifications for disability, finding Plaintiff met Listing 12.02 for an organic mental disorder. He based this finding on Plaintiff's history of a closed head injury with residual right hemiparesis. He found that, as a result, Plaintiff had deficits with memory, personality, emotional lability, and problems with higher intellectual functioning. He found as a result of these problems, that Plaintiff had moderate problems with activities of daily living, marked difficulty maintaining social functioning, frequent problems maintaining consistency and pace, and repeated deterioration in a work-like setting. (This finding was based on the doctor's observations during the interview of Plaintiff's repeated need for redirection and focusing with his conversation.) Dr. Haut opined that Plaintiff had the ability to learn new information if presented in an organized verbal format.

Dr. Haut found Plaintiff's head injury met Listing §12.02, for Organic Mental Disorders, which provides:

> Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:

    1. Disorientation to time and place; or

    2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or

    3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or

    4. Change in personality; or

    5. Disturbance in mood; or

    6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or

    7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Lura-Nebraska, Halstead-Reitan, etc.;

AND

B. Resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Reviewing Dr. Haut's report in conjunction with all the other evidence of record, the undersigned does not agree Plaintiff meets all the requirements of Listing 12.02. First, there is no evidence of the required "loss of previously acquired functional abilities." Second, Dr. Haut opined that Plaintiff's limitations were all due to his accident at age two, including: "He failed to develop appropriate social skills, and has limited coping skills and ability to modulate his affect. From my perspective, most of his behavior problems and difficulty in life are attributable to his early insult to the brain. Certainly, his problems with interpersonal relationships has been compounded as he failed to learn and thrive since then." Yet Plaintiff completed his G.E.D. at age 28, and has past relevant work as a clerk/cashier, as well as past substantial work at McDonald's and long-term almost full-time care of his invalid parents, sometimes concurrently. Significantly, Listing 12.00A for Mental Disorders provides, in pertinent part:

The listings are so constructed that an individual with an impairment(s) that meets or is equivalent in severity to the criteria of a listing could not reasonably be expected to do any gainful activities.

(Emphasis added). In other words, if Plaintiff was so affected since his accident, as Dr. Haut opines, it is highly unlikely he would have been capable of working as a clerk/cashier, especially at the same

time he was providing nearly all the care for his invalid parents.

Plaintiff also argues that Dr. Haut's opinion should have been given considerable weight.

20 C.F.R. § 404.1527(d) provides:

> (d) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
>> (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>>
>> (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.
>>
>>> (I) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times

you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

There is no dispute that Dr. Haut was a one-time examiner. Yet in June 2004, Tina Yost, another one-time examiner, found Plaintiff's concentration, persistence and pace were all within normal limits, as was his memory. Although she diagnosed Plaintiff with major depressive disorder and anxiety disorder, she opined that both were under control with medication. This despite the fact that she was aware of his childhood head injury. Neurologist Navada also was aware that Plaintiff had suffered a severe head injury as a toddler. He also found Plaintiff's attention, concentration, language, and memory normal. He referred Plaintiff for an EEG and MRI which were both essentially normal.

In 2002, Plaintiff presented to United Summit Center for a presenting problem of depression, anxiety, and substance abuse (R. 362). He was seen by a psychiatrist as well as other staff, and the

psychiatrist signed off on his Mental Status Examination Report. On his Mental Status Examination of March 2002, Plaintiff's sociability was found to be within normal limits. His only diagnosis was alcohol dependence. He had never received any services for mental retardation or developmental disabilities. He had no problems and acted independently shopping for food, clothing and personal needs; treating minor physical problems; preparing or obtaining meals; traveling from residence to required destinations; accessing and using available transportation; and accessing and using community services. He needed verbal advice performing household chores, taking care of his own possessions, and taking care of his own living space. He needed substantial help only when handling personal finances. He was found to have a "mild" dysfunction in Self Care and a "mild" dysfunction in Activities of Daily Living. He communicated clearly, typically asked for help when needed, responded to other's initiated social contact, engaged in social and/or family activities; and asserted himself effectively and appropriately. He "somewhat typically" formed and maintained a social network and effectively managed responsibilities and/or family or interpersonal obligations. He did show "generally not typical behavior" in ability to effectively handle conflicts with others. He was found to have a "moderate" dysfunction in the "social, interpersonal and family" domain. In the "Concentration and Task Performance" domain, Plaintiff was typically able to remember locations and procedures; able to understand and remember instructions; able to maintain attention and concentration; able to perform activities within a schedule, maintain regular attendance and be punctual; able to perform in coordination with or in proximity to others without being distracted by them; able to sustain an ordinary routine without special supervision; able to perform at a consistent pace without an unreasonable number and/or length of rest periods; able to complete simple tasks without errors; able to complete simple tasks without assistance; and able to handle small changes

without undue upset. He was therefore found to have a "mild" dysfunction in concentration and task performance. He showed no dysfunction for maladaptive, dangerous and impulsive behavior for the past 60 days.

Upon Mental Status Examination by a licensed psychologist, Plaintiff was fully oriented, his memory was intact, his concentration was good, his thought processes were coherent, and his abstraction definitions were logical. Personality testing suggested a person with a history of alcohol abuse, who, when he abused alcohol, exhibited other acting-out behaviors. He also reported "some" difficulties consistent with "a relatively mild depressive symptomatology." His only diagnosis was alcohol abuse. He got along well with his peers.

In December 2003, Plaintiff's sociability was considered "withdrawn," but he explained he had an inability to maintain a social network due to his parents' full-time dependence on him. He said he was seeking treatment for depression due to his difficulty adjusting to his "new role as primary care-giver for his parents in their home." He said that due to his care-giving responsibilities, he was unable to pursue his own interests, hold a job, or fulfill social, recreational, and health-related needs. The evaluator found no dysfunction in concentration and task performance; no dysfunction for maladaptive, dangerous and impulsive behavior; no dysfunction in self-care, activities of community living, or concentration or task performance; and a moderate dysfunction in the social, interpersonal and family domain.

In January 2004, Plaintiff had a Psychiatric Evaluation in which his memory was found to be intact and appropriate, his intellect average to below average, and his judgment and insight fair. His reliability was in question, however. It was noted he had a history of subdural hematoma.

In March 2004, during a Psychiatric Intake Evaluation, Plaintiff was found to have intact

memory, although he was easily distracted.

In November 2005, Dr. Navada, who is board certified in neurology and clinical neuropsychology, and who is on the American Board of Psychiatry and Neurology, found Plaintiff's attention, concentration, language function, and memory were all normal.

In addition, State agency reviewing psychologists Kuzniar and Roman both opined that Plaintiff did not have a severe mental impairment at all. Dr. Roman expressly found that Plaintiff's anxiety and depression were controlled with medications, and he had only mild restrictions of activities of daily living, social functioning, concentration persistence or pace, and no episodes of decompensation.

Additionally, Plaintiff's reports to various providers are inconsistent with each other, and his reports to Dr. Haut are inconsistent with his reports to other care providers. For example, Plaintiff told the psychiatrist at Sharpe in 2002, that he had a happy childhood and did well in school. Yet in 2004, he reported he had not done very well in school, and in 2006, he reported growing up in a home filled with argument and strife. He was married for three years, and had been in long-term relationships before that. Yet Dr. Haut noted Plaintiff had failed to develop appropriate social skills and his problems with interpersonal relationships was compounded as "he failed to learn and thrive since his accident at age 2." In 2002, and after, Plaintiff consistently stated he had not tried to kill or harm himself. He told the psychiatrist at the time that the cut on his wrist was an accident that occurred while he was drunk, which explanation the psychiatrist found likely true because Plaintiff is left handed and the cut was on his left hand. Yet Plaintiff told Dr. Haut he had tried to kill himself when he cut his wrist. He told Dr. Navada that after being hit by a car he was paralyzed on the right side for three days, but subsequently did well. He testified at the hearing that he did not even know

50

anything was wrong with him until age 19, after he joined the Army. Yet after the ALJ's decision, Plaintiff told Dr. Haut that after his head injury he had been in a coma and hospitalized for a month. He reported to Dr. Haut that he had difficulty running a cash register because of his right hemiparesis, which he never before stated, even at the hearing. Besides which Plaintiff is left handed.

The undersigned therefore finds Dr. Haut's opinion is not supported by and is inconsistent with the record as a whole, and is therefore not entitled to significant weight.

Significantly, Dr. Haut's conclusions were based on Plaintiff's childhood severe head trauma. He found Plaintiff failed to develop appropriate social skills, coping skills and ability to modulate his affect, attributable to that early insult to the brain. "Certainly, his problems with interpersonal relationships has been compounded as he failed to learn and thrive since then." (Emphasis added). Yet there is no dispute that Plaintiff earned his GED at age 28, and performed his past relevant work as a clerk/cashier as well as other jobs, all while caring for his invalid parents. In Cauthen v. Finch, 426 F.2d 891 (4th Cir. 1970), the Fourth Circuit noted that the claimant had presented two medical bases for her disability claim-- a partial impairment of vision in one eye and an arthritic condition. The Court then held that the vision impairment was not disabling because the evidence "reveal[ed] that the eye problem is one of long standing and that claimant has worked regularly for many years affected to virtually the same extent as at present . . . . Claimant quit work of her own volition rather than upon the advice of doctors." In the present case, not only did Plaintiff work at the particular job the ALJ found he could still perform while suffering the effects of his head trauma, but he also cared for his elderly, disabled parents at the same time. There is ample evidence that he, like the Plaintiff in Cauthen, " worked regularly for many years affected to virtually the same extent as at

51

present" and that he "quit work of [his] own volition rather than upon the advice of doctors."

The undersigned therefore finds substantial evidence supports the Appeals Council's determination that the new evidence would not have changed the ALJ's decision.

The undersigned United States Magistrate Judge cannot overstate the significance of Plaintiff's own statements and testimony regarding his reasons for quitting his job. Those reasons were, as the ALJ stated, admirable. Yet, as the ALJ also told Plaintiff, the government does not pay benefits for care-taking responsibilities. Aside from Plaintiff's statements, his own daily activities show he did provide most of the care for his parents, and, all other arguments aside, his ability to do so without much help is also substantial evidence that he was not disabled.

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's decision that Plaintiff was not under a disability, as defined in the Social Security Act, at any time during the period at issue, i.e., since February 27, 2001.

## VI. RECOMMENDATION

For the reasons herein stated, I find that substantial evidence supports the Commissioner's decision denying Plaintiff's applications for SSI and DIB. I accordingly recommend Defendant's Motion for Summary Judgment [D.E. 16] be **GRANTED**, Plaintiff's Motion for Summary Judgment [D.E. 14] be **DENIED**, and this matter be dismissed from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to United States District Judge John P. Bailey. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of

the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 2 day of July, 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE